Case is LeQuita R. Whitfield v. Selene Finance LP 24-14257. Ms. Leighton, you may proceed. Good morning, and may it please the Court, Shelby Leighton for Appellate LeQuita Whitfield. When Ms. Whitfield fell behind on her mortgage payments, she received a letter from Selene Finance falsely threatening to foreclose on her home if she didn't pay the amount owed within 35 days, something Selene could not legally do within that time frame. The threat of imminently losing her home terrified her. She jumped into action by trying to borrow money so she could pay the debt before the 35-day deadline and calling Selene to find out her options. Ms. Whitfield later found out that Selene's threat was false and sued Selene under the FDCPA and Georgia law, but the District Court dismissed her case. It was wrong to do so for at least three independent reasons. First, it held that she didn't have standing despite two injuries she suffered in reliance on Selene's letter, emotional distress and time spent trying to borrow money to avoid foreclosure. That was contrary to numerous recent precedents of this Court recognizing that emotional distress and lost time are each concrete injuries that support Article III standing. Can I ask you a couple of questions just to clarify sort of the the factual procedure that we're dealing with here? So she has a mortgage, she doesn't dispute the legitimacy of the mortgage, correct? Like she entered into that, there was no fraud, nothing like that? Right. Not like waters, so she has a mortgage, she misses a payment, she doesn't contest that, right? Right. Okay, so she gets a letter and the problem with the letter is that it says she has 35 days to pay. The letter, you would concede the letter would have no issue if the letter had said 75 days, right? I'm not sure about the exact timing, but it's 120 days from... Versus she was, they told her 80 days and she was entitled to 120 days, right? So we have a 40-day discrepancy. They told her 35 days from that date and yeah, but it was 120 days from the default. It was 45 days short of, I mean 40 days short of what she's entitled to legally, correct? Sure. Okay, so she's in default, she gets a default letter. She's not quibbling with the fact of a default letter, she's quibbling with the time frame to remedy the situation before foreclosure. So, and then in her complaint, she had said she called Selene and that's all it says. That's all that I found in the complaint. It doesn't say how many times she called Selene, it doesn't say what she called to talk about, doesn't say how long the call took. Do, am I correct, we have no other information about that? Well, she not only called Selene, but she also sought to borrow money from her brother. Right, I'm just talking about the call right now. But yeah, for the call, it just says she called Selene. It just says she called Selene, that's all we know. Okay, so she's in default, she gets a default letter, she calls Selene. She also borrowed money, and this is, and this is my final part of this sort of making sure I understand the factual fabric of all of this. She borrowed money from her brother that she didn't end up using, didn't need to use to remedy the default. And so, am I correct on that front? She did not need to use the money. But so, how is it a harm that she suffered that she borrowed money that she didn't use to pay the default? It's not the borrowing of the money itself, it's the time spent trying to figure out how, like, how she was going to get the money to pay within 35 days, which included contacting her brother to try to borrow money. And we don't have any details about that, about how long that called, how long that took, whether she called, had to go by, anything like that. We do not have details in the record, and you know, we would gladly amend the complaint to add more details about both of these, but I don't think that that is necessary here. I was curious, actually, why, one of my questions was going to be why borrowing money from her brother wouldn't be an injury, even though she didn't ultimately have to pay it. You know, presumably for some time period she had, you know, she was in debt to her brother. We don't know what the terms of that debt were or anything like that. I guess is the rule that if you, would your rule be that unless she, I mean certainly you're not saying unless she had to pay the actual debt or unless she chose to pay the debt, that that would not be enough for injury, right? I think that's right. So the injury here is that she relied on the false statement in the letter, and that reliance caused her two types of harm. One, the stress of believing that her home was going to be foreclosed on and that she was going to have to figure out a way to pay within the 35 days, which for her involved then reaching out to her brother and borrowing that money. And I think that is related to the emotional distress, because it is an injury to have to borrow money and to be in debt, even if, you know, I don't think there's anything in the record about her owing interest or anything on that. But she wasn't, you know, that would make her in debt to her brother. She's stressed about her financial situation. She doesn't have enough money to pay the things she thinks she needs to pay before her home is foreclosed on. And so I think it's the combination of the time spent dealing with that and the stress that it is causing that is the injury. And that is exactly the type of injury that this court has recognized in numerous cases, including most recently, there's the Walters case that recognized that lost time and emotional distress are concrete injuries for Article III purposes. And in the FDCPA context, in particular, there's the Revis case, which focused on, quote, extreme stress as an injury and reliance on a misleading debt collection letter. And the Toast case that focused on times wasted in trying to figure out the amount of a debt and emotional distress. And so I think... And you deal with the Nelson case, the 28-J letter? Yes. Particularly because Walters had money spent. He had spent money faxing documents. I mean, had money spent. And also he was denied credit on other purchases. Walters has a lot more than this case, correct? Right. So I think... Okay. So deal with the Nelson case they just filed that said... You know what he said. Sure. So I think the difference between the Nelson case and the Walters case in this case is... I want to know what Nelson in this case. Okay. Nelson in this case is... Walters is very different. Nelson is a Fair Credit Reporting Act case, and it has to do with an inaccuracy on a credit report. Well, so does Walters. And so does Walters. That's right.  And so those are a line of cases that are talking about, if there's an inaccuracy on your credit report, but no one ever sees it, is that an injury to you? And in Nelson, the plaintiff tried to say, well, it's an injury to me because I was stressed by the fact that this inaccuracy was on my credit report, even though nobody saw it. And the court said, you can't bootstrap the lack of harm by saying I was emotionally distressed by something. Here, in the FDCPA context, this court held in the Treschel case that you have to show, when there's a misleading debt collection letter, you have to show reliance and an ensuing harm. And the reliance is really what distinguishes this case from the Nelson case and that line of cases. So you're really not relying on Walters because you can't in light of Nelson? Well, I think Walters stands for the general proposition that emotional distress and lost time can be concrete injuries. But the important piece is that there also has to be reliance. And so here, there's both reliance and emotional distress and lost time. And that is because this is a FDCPA case. And so it's not that in every case where someone just alleges emotional distress or just alleges lost time that there will be Article III injury. I think what we see from Treschel, it seems to recognize that lost time would be a concrete injury if the person were responding to something that actually created either harm or risk of harm. Right? I think in Godiva, one thing we discussed was you can't center your claimed injury on lost time if you're using your time to respond to a non-existent risk. Right? That's right. That's the reliance piece, I think. So what's going on, for example, if Ms. Whitfield had just received a letter that had her address wrong, but she still got the letter, it was fine. She might spend time trying to fix her address, but she's not actually relying on that. She knows what her address is. She got the letter. There's not actually that separate harm. Here, what's happening is there's a misleading statement in the letter that she relied on, and she believed she had to pay within 35 days or face foreclosure, which was false. And so she relied on that, and the time she spent was in direct reliance. The letter actually says, because there are two sentences in the letter that you challenge. The first sentence, if you have not cured the default within 35 days, Selene may accelerate the maturity and declare all amounts due and payable. That first sentence says nothing about foreclosure, correct? That's right. Although, it just says we can declare everything due and payable. So there's nothing in the first sentence where the 35 days is that mentions foreclosure at all. Well, it talks about acceleration, which Selene also cannot do after, until after 120 days. Okay. Did you make that claim? Because I didn't see that. Yeah. So it's a combination of the acceleration and foreclosure. So it's not, so you're saying they can't accelerate under the terms of their documents that amount due. Their internal policy and the. I'm not talking about the internal policy. I'm talking about what the loan documents say. It's, I don't believe it's in the, I don't know if it's in the loan documents, but it's in the regulations. Loan documents allows them to accelerate within 35 days. Okay. I know what you say the internal policy is. They don't do it. It's not just the internal policy. It's the regulations that govern what they can and can't do as a lender. Okay. But they're not accelerating the amount due. That's right. There's nothing about foreclosure there. Right. And then when you get to the foreclosure sentence, the next sentence says your property that is collateral may, and it's got then be scheduled for foreclosure in accordance with the terms of the deed and applicable state laws. So the 35 days isn't applying to foreclosure. It's only applying to acceleration. It's saying. By the terms of the letter. It's saying if you haven't heard that it cured the default within 35 days of this notice, they will accelerate and then your property may then be scheduled for foreclosure. No, it says your property that is collateral may then be scheduled in accordance with the terms of the deed. It doesn't say anything about 35 days in the second sentence. The second sentence itself doesn't mention the 35 days. Right. No. And in fact, it says in accordance with the terms of the security deed and applicable laws. So why wouldn't that be correct? Sure. So I mean, I'm trying to see what's really misleading about this. It didn't seem to me that the foreclosure part was misleading. So first of all, we're looking at this from the perspective of the least sophisticated consumer who is a person who is ignorant, unthinking, gullible, and a below average sophistication or intelligence. Second of all, this court has said in the LeBlanc case that if there's multiple inferences to be drawn from a particular language in a debt collection letter that that question goes to the jury. It's not something that can be decided as a matter of law. And so even if you could read this letter, as you're saying, as suggesting that foreclosure would only happen within 125 days. So I have to read into all implications and inferences the least sophisticated consumer might make. That's right. So in the LeBlanc case, there's a couple principles that I think are helpful here. One is that you can't include caveated language that is overshadowed by the threat that you're making. Was LeBlanc a notice of default or really a debt collection letter? In LeBlanc, it was a threat to sue if the person didn't pay within 35 days. It was a debt collection letter. Yeah, so it wasn't a mortgage, but it was a similar situation where they said, you need to pay this default within 35 days. If you don't, we may sue you. And what the court said is that could be read to mean that we might sue you at some point in the future, or it could be read to mean we're going to sue you on day 36, and that would be misleading. Can't we reasonably assume that the mortgage company would not have made the assertion that it was due sooner than it's really due under the law for purposes of foreclosure or accelerating the debt if they didn't think that the consumer would read that and think so, right? I mean, it seems to me that we're not looking for whether technically maybe this is not completely factually untrue. I like to think that I'm maybe at least not an unsophisticated consumer, and if I got this letter, I would lose my mind, right? And I think that's the intention of it, at least we can assume until further discovery. So, I mean, it seems that under the unsophisticated consumer standard, you know, whether or not we get there on all the other elements, it seems that it's not hard for me, speaking only for myself, to see that this letter is at least misleading to the unsophisticated consumer. That's right, and I think that's particularly true at the motion to dismiss stage. So, a jury may ultimately find, they might read this and say, you know, no, I only read it one way, but that's not where we are right now. We're at the very beginning of the case, and when there's multiple inferences that could be drawn, and one of them is something that would be misleading to the least sophisticated consumer, it's not even the average unsophisticated consumer, it's literally the least sophisticated one, that that is, you know, that should not have been decided as a matter of law by this court that you could only draw one inference. Why don't you use your time on the second ground, the district court, the alternative ground? On the notice and cure provision? Notice and cure provision. Sure, so the district court, in deciding the issue about the notice and cure provision— That was an alternative ground for the dismissal, correct? That's right, and I do want to point out with that that once the court decided that there was no standing, it should not have reached any of these other issues. So, they were all alternative grounds for its holding, but it didn't have jurisdiction. Let's say we reverse on the standing. Don't we then reach the second issue then? Yes, absolutely. Okay, so that's why I say address the second issue. Yes, so the district court primarily relied on the Northern District of Illinois decision in Milam v. Saleen Finance, and since the district court decision was decided, the Seventh Circuit reversed that, and what the Seventh Circuit held in Milam was that the district court could not conclude as a matter of law that Saleen wasn't a sign of the lender just because it was the loan servicer, and— And I agree with that, but here, in the record, we have a power of attorney. Right, so the power of attorney is different from— That gives them—I know it's not an assignment, okay, but the power of attorney, if you look at the terms of the power of attorney, it doesn't say it's an assignment, but it says we give you all of our rights under the security deed. It does everything but use the word assign. That's correct, right? I actually disagree with that reading of the power of attorney, but even if that is your reading of the power of attorney, it— The power of attorney is so you stand in my shoes. You can do whatever I can do under the security deed. You can foreclose. You can give notice. You can, of default, it's a really broad power of attorney, right? What the power of attorney does is it gives— Let me start with it's a very broad power of attorney and gives them all rights. It may not be like an assignment. It gives them the right to sign documents on behalf of the lender is what it does. It says to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described below. That's it. That's what it gives them the power to do is sign documents on behalf of the lender. But the tasks described below also continue to make it broader. The tasks described below are to take particular actions on behalf of the lender. They're not assigning the right to do that. And why that is important is because in the provision that Selene is relying on in order to be able to enforce the notice and cure provision is the provision that says that it allows assigns to enforce provisions of the mortgage. It There's nothing about agency. There's nothing about powers of attorney. And so in order to be able to enforce the notice and cure provision, Selene can't just show that it is the agent of the lender. It must show that it is a sign of the lender under that provision. And then here in this case, if this case were being brought against the lender, it's possible that Selene could enforce the notice and cure provision as an agent of the lender because it would be acting on behalf of the principal. But you can't, if you're an agent for somebody, that doesn't give you the power to act on your own behalf to enforce provisions of the mortgage. So typically a power of attorney is not just signing for them. The whole purpose of a power of attorney, I gave one to my husband. Okay, he can go borrow money in my name. He can go take money out of my account. He can go do anything I could do. And this with this power of attorney seems to do is put the servicer, it's different from the Seventh Circuit case, put the servicer in the shoes of the lender by saying you can demand, you can send out a notice of default, you can foreclose on the properties pursuant to the security interest. So it can, even if it can do all those things on behalf of the lender, what it cannot do is enforce the notice and cure provision on its own behalf. And that's, so a power of attorney only gives someone the power to act on behalf of the principal as for the scope of the power of attorney. It doesn't give them unlimited power forever to enforce every provision of a contract. And so what that means here is that if they were acting on the lender's behalf and enforcing the power of attorney, but they're acting, they're trying to avoid their own liability in enforcing the notice and cure provision. And hasn't Selene, whether or not this constitutes judicial estoppel is a different question, but hasn't Selene in other cases indicated that it had a more narrow understanding of its role under the contract than it's asserting here? That's right, and cases have held that. So whether or not you look at it as judicial estoppel, there are cases holding that Selene does not have a contractual relationship with the borrower that allows it, that requires it to be bound by the mortgage. And now Selene is turning around and saying, well, we've argued in other cases that we don't have that contractual relationship, but now that it benefits us, we're going to enforce the contractual provisions against the borrower. I think that if this were a breach of contract case, you know that Selene would be arguing that they're not bound by the provisions of this contract, which is what happened in those other cases. And power of attorney and assign are obviously different, and agent, are all three different concepts, right? So we have to assume that they do different things. Yes, absolutely. And again, the Georgia law distinguishes between those two very clearly, between a power of attorney and an assign. And for an assign, it requires both a transfer of ownership of, it's not just, you can't just hire somebody or authorize them to act on your behalf, you're actually transferring your ownership in the rights to that person. And that's exactly what the court said in Milam, is that you are, you can't know whether that transfer of ownership... There was no power of attorney mentioned in Milam. That's right, there's no power of attorney mentioned there. I mean, it's just, you're as a loan, they just stood on their rights that they're an agent as a loan servicer. That's what that case was. In Milam, what they did is they argued pursuant to the mortgage, that they were an assign of the lender's rights. And that, and what the court said in Milam is that without proof of the contract transferring you ownership of the lender's rights, you cannot show as a matter of law that you're an assign. And that's exactly the same thing here. What Selena's relying on is Section 13 of the mortgage, which says that successors and assigns can enforce the mortgage provisions. And what we're arguing here is that you need to have evidence of an assignment before you can say that you're an assign, and that evidence has not been put in the record. And they're saying that power of attorney is this, we'll ask your friend on the other side, but they're saying power of attorney is enough, and you're saying under Georgia law that's different, right? That's right. Power of attorney is a different thing under Georgia law. There's the Alliance Life Insurance Fee Rydell case that distinguishes between an assignment and a quote, mere power of attorney, and makes clear that there has to be an assignment in writing in the record in order for someone to rely on that as a basis for enforcing a contractual provision. And that's exactly the situation here. Thank you. I've got one more question back on the injury issue. I want to make sure I'm understanding your assertions. You're saying that wasted time is a concrete injury, correct? That's right. Or a tangible injury rather than an intangible injury? Right. For Article 3 standing purposes, waste of time is a concrete injury that allows someone to tangible or an intangible. Both can be concrete. That's not the kind of distinction I'm making, but you can have a tangible concrete injury or an intangible concrete injury. Which sort of concrete injury are you saying that emotional distress is? I think it would be an intangible concrete injury under the Supreme Court's case law because I think tangible injuries have generally been things like economic injury, loss of property, loss of money, things like that. In your view, does that mean that you then need to show a kind of comparable common law injury? Or do you think this is different for some reason? No, I think that the comparable common law analysis from TransUnion and Spokio would apply here. And this court has applied that analysis in other cases to hold that both emotional distress and lost time have comparable common law injuries. What would you say is your best emotional distress case from this court? The Revis case is, I think, the best case because it relied on Treschel, which did that common law analysis. And Treschel, it went through the whole common law analysis, found that for debt collection cases, you need reliance and an ensuing harm. And then in the Revis case, the court relied on Treschel and found that emotional distress was the type of reliance, ensuing harm that would apply. But did Revis make an analogy to a common law harm of some sort? It didn't itself, but it relied on Treschel, which had done that analysis and sort of set out the test for debt collection cases. I think what this court hasn't done is we also make the argument that intentional inflection of emotional distress would be a comparator tort. And that is not an analysis that this court has done. But this court, I don't think it needs to do that here because there are cases already holding that emotional distress is a concrete injury for Article III purposes that relies on cases like Treschel that did a common law analysis. But if it did go through that analysis, I think the type of harm in an intentional inflection of emotional distress case, which is sort of the foreseeable emotional distress of conduct that is intended to cause that emotional distress, is exactly the type of harm that is at issue here, which is, you know, they sent this letter intending to scare Ms. Whitfield into paying, and she was, in fact, scared. And so that, I think, also would meet the common law comparator test if you compared it to an intentional inflection of emotional distress. Got it. Thank you. Thank you. Mr. Lemke, you may proceed. May it please the Court. I want to start, Judge Grant, with your comment about lost time and whether it's tangible or intangible. I think this court in Muransky v. Godiva indicated that it was an intangible harm, that they suggested that loss of money and physical injury would be tangible. But it doesn't matter because in that Muransky case, this court said, although we have held that allegations of wasted time can state a concrete harm for standing purposes, we have also declined to find standing when no such allegations were pleaded. And this court, in that en banc decision, went on to say you had to plead the lost time explicitly. And that goes to Judge Branch's point from a minute ago, that if you look at the complaint, there's not one mention of lost time related to either the call to Selene or the borrowing of the money. And so I don't think they can get there. I think what the district court did here is went down the well-set-out path from this court as to how to approach a case. But if we're talking about notice pleading, I mean, can't you infer that if she's saying, I called the company and I worked with my brother, can't you? I mean, obviously, those things take time, right? Your Honor, I don't think, I think that would be departing from what this court said in Muransky v. Godiva. I mean, as I recall in Godiva, you know, kind of later, that was right after Spokio. This was a developing area of law. And later, I think, she tried to come up or he tried to come up with kind of a lot of extra reasons. Maybe I'm incorrect about that, but that's my reflection. I mean, Your Honor, it's the decision in Muransky says pleaded. And so pleading— No, I understand. But what I'm saying is I think you could, I think it would be fair to read a I did this and I did that, which I wouldn't have had to do if I hadn't received this false letter to be pleading. Whereas in Muransky, they redid everything after Spokio. In Muransky, the whole cause of action was you have violated this statute in a technical way. That is my injury. We win. I think this is different than that. Your Honor, I respectfully disagree because I think, you know, under Iqbal and Twombly, you couldn't, you can't make even a conclusory pleading. And the suggestion that a reference and the statement in the pleading is, I wrote it down, paragraph 114, plaintiff called Selene in response to receiving the final letter. That's it. The suggestion that that would call in a concrete harm of lost time, I just think that is not consistent with what this Court— What about the time she spent dealing with her brother? I think, again, it's just a bare-bones statement that doesn't in any way refer to the time she spent. So under the direction that this Court set out in Muransky in the en banc decision, I don't think that's enough. You have to recognize, though, that the first, the pleading in Muransky was obviously based, and I believe that this is what, I believe the opinion said this too, on the theory that any violation, no matter how technical, caused an injury to the person who received the receipt with too many digits. And that you have to concede that that's different than this. She is not just saying, as a technical matter, this was wrong, therefore I have an injury. I would agree that it's different, Your Honor, but I also would agree that at the time this complaint was pleaded, this circuit court had set out very clearly, you've got to plead lost time, and they didn't do it. And we've been through two complaints in this case and they haven't done it. So I don't, I think it's too much of a leap to get there from that. And so I think what the the words lost time just, you know, didn't, are never mentioned. Time is never mentioned at all in that complaint. Well, and what do we make of the fact that she, in fact, had defaulted, that she was entitled to receive a default letter, but the days were wrong? So she's, if she had gotten a letter that properly said 75 days, presumably she would have called Selene, she would have called her brother. Does, is that a distinction without a difference? Your Honor, I think it certainly underscores why it's important to plead it if you really say it's a concrete harm because of the letter you received as opposed to the general situation. And so, you know, I think what the district court did here is all, you know, let me say on the emotional distress side of it, this court in Hunstein, which was another critical en banc decision that is never cited in the red brief, never cited. What that court, what this court said there is you find with these intangible injuries the appropriate comparator tort. This court has already said in Trischel the appropriate comparator tort for these subsection, claims brought under these subsections of the FDCPA is common law fraud, which requires actual pecuniary harm. And so that's what we've got here in these emotional distress cases they bring up. So I think, I'm not as sure that I read Trischel, and I'm obviously pretty familiar with Hunstein too. By contrast, the common law furnishes no analog to the FDCPA claim asserted here, the closest historical comparison to causative action for fraudulent or negligent misrepresentation, right? I don't know that that means any FDCPA claim that the common law tort has to be. Well, I went back and looked to make sure I knew exactly what was asserted here, and it was a claim under the exact same subsections of the FDCPA is here, 692E and 692F. So I don't know how, I don't think you can read Trischel as anything other than when you've got a claim for a misleading statement based on 692E that the appropriate comparator tort is common law fraud. And that makes sense because what we're talking about here is they say you made a misleading statement. That sounds in fraud. And the appropriate comparator analogy then means you've got to have justifiable reliance and pecuniary harm, which they don't have here. And I think the district court then was really doing exactly what this court had set out for it. So I think the bottom line is the district court was correct in applying this court's precedence to conclude that there was no standing. Now let me turn to the point you made, Judge Hull, about whether it was actually misleading under the statute. And I want to say I think my friend made a misstatement of federal law in her remarks to you in that I do not believe Regulation X or anything else has any time limit for when you can accelerate. To my knowledge, there is no requirement under federal law that you have to wait 120 days to accelerate. Have you made that argument here? I don't remember that. Pardon me? I don't remember that argument. They never made that argument that there was a problem with acceleration under the law. I didn't recall that being the misleading statement. They never said acceleration was misleading. It was the foreclosure that was misleading. That's exactly right. I'd have to go back and look at the complaint, but I don't think it was all misleading foreclosure. I agree with that. And so we didn't raise it. There was no acceleration issue. Right. And so I think you're correct, Judge Hull, in focusing on the first sentence deals only with the acceleration, and then it goes on in the second sentence that you pointed to that talks about it may then be scheduled for foreclosure, may, without a specific time frame, in accordance with the terms of the security deed. Well, if you look at the security deed, it makes very clear they're obligated to follow federal regulations. And so, you know, this court in its unpublished— Is the least sophisticated consumer going to know where their security deed is and understand it and understand that that means that it can't really happen? And if that is what the least sophisticated consumer would mean, then why in the world would the letter say that instead of saying the correct time period? Well, Your Honor, I don't think there's anything inaccurate about the time period as stated here, because actually under the note it said they had to have at least 30 days to correct the default. Here it's 35. And so I don't think there's anything inaccurate about the 35. There's nothing inaccurate about the foreclosure or about the acceleration. And then on the sentence about the foreclosure, it says we're going to follow the security deed. Now— Right. That's my question. What do you think? And do you think it's really possible that your client thinks that the least sophisticated consumer—not a good consumer, not a consumer who's been to law school—the least sophisticated consumer will know to go check their security deed and interpret the law and find out that they can't really foreclose quite yet? Well, this court in its Moore decision, which is unpublished, which dealt with a very similar argument, rejected the idea that you had to spell out all the applicable provisions of law. And the notice— But this is not spelling out all the applicable provisions of law. This is a statement designed quite obviously to get the person to think that they'll be foreclosed on an X number of days if they don't pay. Well, actually, Your Honor, if you read the notice as a whole, it goes on and there's almost a second page that talks about all the things they can do to work with Selene to avoid that result. So I think you have to— Right, but under the law, they don't have to do those things. Let's say that this person is expecting a big paycheck in 40 days, and so after that, they know everything will be fine. They don't need to do all these things. Well, Your Honor, I mean, first of all, it goes back to Judge Branch's point that they— I mean, the threshold point I want to make is, well, they are in default. And so there's— And so sending them a notice of default and noticing— Absolutely, of course. I mean, and telling them that, you know, if they don't do something in 35 days then, well, you know, what was— What they said in this default notice, I might add also, is exactly what the security deed says they had to tell them in paragraph 22 of the security deed at Appendix 72. But I go back to what this Court was dealing with in Moore, which is, well, when you said whether if it's permitted by law, that this Court, in an unpublished decision, but a thoroughly, you know, a lengthy discussion of it, did not accept the notion that you've got to tell them then what the law is. And under LeBlanc, what this Court said about least sophisticated consumer is you possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care. And the suggestion that telling someone, hey, we're going to follow the terms of your contract means you're misleading— And why would the debt collector include a date that is not consistent with the law? If they could not foreclose on the day that it suggests that they're going to foreclose, why would it do that if not intending to mislead the consumer to get them to, say, borrow money from their brother and pay sooner than they would otherwise? Well, Your Honor, I would start with paragraph 22 of the security deed, which talks about one of the things the notice of default must include is a date not less than 30 days from the date notice is given to the borrower by which the default must be cured. That's exactly what they were doing. And— Right, but you have not contested, and I don't believe you're contesting that foreclosure actually could have started under the law on the day that this letter suggests that it might. As we spell out in our brief, Your Honor, it's important to note that there is not an absolute 120-day deadline under federal law. There are provisions that make it shorter than that. For example, if it was discovered that Ms. Whitfield no longer had this home as her primary residence, the 120-day limit is out the window. So, I mean, the question is, are you going—you know, I think what this Court indicated and more is you can't attach the CFR provisions to this or spell out every combination and permutation of law. But I would suggest, Your Honor, that when you tell someone, we'll set the foreclosure in accordance with the contract, the idea that that's unfair or misleading— If that's all it had said, then maybe you're right. But it—I mean, I don't think you've argued that it suggested that this would happen sooner. Well, I—what I've argued is it's possible it could happen sooner, and to Judge Hull's point, for that first sentence where it mentions the 35 days, that talks about acceleration, and under the law, that could happen sooner. You've told us that we shouldn't think about acceleration, right? Well, but I'm getting the point. You're focused, Your Honor, on the 35 days, and my point is the only reference to 35 days is in the sentence about acceleration, and acceleration could legally occur in less than 120 days. And there's a provision in the contract that says if we haven't done something in the past, we don't waive our ability to do it in the future. I just look back at the complaint. They do make an acceleration misleading claim, but it's not over the 30, 35. It's that their internal policy is we don't accelerate for 120. They do refer to acceleration in the claim, but they say it was misleading, not because of the deed, but because their internal policy is they didn't follow that. So, that made it, that first sentence, in and of itself misleading. I don't know how the district court dealt with that because I focus more on foreclosure, but there is something in the complaint on acceleration as being misleading because your internal policy, you don't accelerate for 120. Well, and let me say, Your Honor, that's all based on a deposition, and we, in the record, is the more complete version of that deposition. And if you look at that, all of that is tied to the 120 days for the foreclosure, which as, you know, A, is not absolute. There are situations where it can be less than 120 days, so the may is accurate. And B, there is nothing to prevent Saleen from changing its mind about an internal policy. And again, the security deed indicated... Can we go back to standing? What do you contend is your best standing case? I think my best standing case is Trischell and Hunstein. And then, you know, the Georgia state law cases we've cited that say for the common law tort of misrepresentation, you've got to have pecuniary harm. And then, you know, and I would throw in the Muransky point about lost time having to be pleaded. So it's that triumvirate of cases, Trischell, Muransky, and Hunstein. On the notice and cure issue, you have power of attorney. How are you assigned? Your Honor, I think, as the district court noted, the power of attorney is an alternative basis. I think, and so that sort of stands by itself. But what I would say on the assigned point is the complaint is premised upon the notion that we were sending the notice of default as the servicer of the loan. The loan, the security deed itself contemplates that there are going to be, I think, the assignment of duties to it. And then at the Appendix 110, they received a notice of assignment, sale, or transfer of servicing rights. So they were told, Selene has been assigned, sold, or transferred. When you're assigned, sold, or transferred, that's Record 110 in the Appendix, you are then a successor or assigned. And so, and you don't really, you know, albeit we do not have the written assignment in the record, but there is enough in the record to conclude that they were an assignee when they sent that notice of default. Now, separate from that is the whole power of attorney, which the district court relied on in the alternative. And I think that power of attorney is broad, as Your Honor noted, and expressly authorized the sending of a notice of default. And then in Paragraph 3, which is at Appendix 238, allows them to transact business of any kind to secure performance of any obligation or agreement relating to the note. And my point of saying all of that is, you know, as the Costello case indicated, if you are exercising the authority of the age, as the attorney, in fact, under a contract, you then get to take on the protections according to the principle that they would have had if they had taken the act. So I believe the Costello case stands for the proposition that we certainly can invoke Notice and Cure, but I think that, you know, the power of attorney is broad enough for us to invoke it there as well. So that's my answer on Notice and Cure. You can get there down the assigned route or you can get there down the power of attorney route. And I see my time has expired and we ask you to affirm the district court. Thank you, Mr. Lemke. Thank you. Ms. Leighton, you have three minutes. Ms. Leighton, so there is an assignment, a sale, transfer, or assignment that was, I guess, Notice was provided to your client? There is no assignment between the lender and Selene in the record here. And in fact, He just says there's a reference to it at record 110. There's a reference to the loan being, the servicing rights to the loan being transferred from one servicer to another. He said the loan was transferred to the servicer. So you're saying if I look at record 110 in the appendix, it won't be what he says, whatever that is. I'd have to go back. I believe what he's referencing is a letter that was sent to Ms. Whitfield that says Notice of Assignment, Sale, or Transfer of Servicing Rights. And it describes how the servicing rights are being transferred from an entity called Shell Point Mortgage Servicing to Selene. Okay, that's good. We'll have to look at the document. You're saying there is no... So there might be a transfer. This is, I think this is an important distinction. There might be a transfer of certain rights between the original loan servicer and Selene, but there's no evidence in the record of what rights were originally transferred from the lender to the loan servicer, the first loan servicer. And so I'd point you, so first of all, I think this is just a factual question that needs development and shouldn't have been decided as a matter of law. But I will point you to the Dominguez case in the Northern District of California, which is against Selene and where there has been factual development. And it turned out that Selene was not an assigned, that it had been hired as a loan servicer, but that it had not been, it had not had the transfer of ownership of rights under the mortgage to it. And in fact, the lender had expressly retained all ownership of rights under the mortgage in that servicing agreement. And so it is possible for a loan servicer to be hired to service the loan without actually becoming an assigned of the lender. And because that is Selene's arrangement with the same lender in another case, I suspect that that is what will turn out to be the case here. But again, Selene has chosen not to put that assignment in the record. I also just very quickly want to address the point about the amount of time spent here. Because in the Toast case, this court noted that, there could be some de minimis amount of mere seconds that would not be enough time, but it found that several minutes was enough time. And so I would submit that even though there's nothing in the record here about the amount of time it took to call Selene or to call her brother, we can assume that it took more than a few minutes. It says time is intangible, not tangible. What do you say to that? Again, I don't think that it really matters because this court has gone through in Tricia the analysis. Let's assume whether it's tangible or intangible matters. What did you claim in your briefing? Was it tangible or intangible? I think it can be tangible or intangible. I think it can be tangible in the sense that it can be a concrete loss of a monetary type loss in that you have an opportunity cost of your time and you're spending your time on something that you could be spending on something else. Have we got the time quantified anywhere? We did not allege a specific amount of time in the brief. But I think that... So to be tangible, you would have to have some of it. I don't know what your position is. I'm trying to understand it. So time can be tangible or it can be intangible. I think the distinction between tangible and intangible is just whether you need to go through the common law comparator analysis. So I think that for tangible, usually the court has looked at that as things that have sort of a quantifiable monetary or property component. Like a thing you can hold in your hand. And I think lost time can be that in the sense that you are spending time that you could be using to your economic benefit on dealing with this stuff. And so I think in that sense, lost time is a economic injury. But I think even if you don't look at it as an economic injury and you look at it as more intangible than that and just like the stress and frustration of spending the time. But your position is two minutes of lost time is enough. That's what this court said in the Toast case. That's correct. The problem with all these other cases, you mean Toast or Loesch? Toast. Toast, okay. T-O-S-T-E. See, all of these cases have other things. This is the problem with these cases. They've got other things going on because they're debt collection cases. They couldn't get credit because of the error or they missed out on a purchase. It has other things. I'm looking for a case, and I couldn't find one, maybe you can tell me, where the only allegation of injury in fact is lost time and emotional stress. That's all there is. Right. No other cases seem to have that. Doesn't mean it's not enough, but none of them were just limited to those two things. They all had something else, paying to fax documents or they couldn't buy something. They all had something else. Am I right about that? That this is the only one that just has lost time and emotional distress? So in the Revis case, it was only emotional distress. So I would say that's even less than here. And that court was applying the Trischel test, where I think the piece that's important here was Revis. Okay. What else besides Revis? So that's the only one that is just emotional distress. And then you're right, there are other allegations in some of these other cases. All of them have other allegations, but they have dicta in them that says lost time's enough. They have emotional distress is enough. They've all got these broad statements in them. They say each one independently would be enough. That's right. Brasher wrote an opinion that says each of these, and then he just joined an opinion that just came out that went the other way. I'm having a hard time with our precedent. I think that the touchstone here, again, is the reliance. And so what we have here is under Trischel, we have the reliance that then caused specific harms. So it's not just that you could have a case where all you have to do is allege, I felt bad because this technical statutory violation happened. What's happening here is that there's a misrepresentation, she's relying on it, and that's causing harm. I don't know how you separate I felt bad from saying you relied on it. I mean, it seems like that's kind of implied you relied on it to feel bad. If you didn't rely on it, you wouldn't be feeling bad. Well, in a lot of these, I think that's what's going on in some of these cases where courts are saying there isn't any standing is that there isn't any reliance on it. And I think you can also look at that as sort of the other elements of standing. There's the causation element and the traceability element. So you have to actually allege that the emotional distress you felt was because of whatever the statutory violation was, which is clearly met here and is sometimes not met in those cases. But I think that, again, reliance is clearly the place you have to start. And then you look at the harms that flow from that reliance, which here were both lost time and emotional distress. And didn't Trishel emphasize that? The plaintiff seeks to recover for representations that they contend were misleading or unfair, but without proving even that they relied on the representations, much less that their reliance caused them any damages. By jettisoning the bedrock elements of reliance and damages, the plaintiffs assert claims with no relationship to harms traditionally remediable in American or English courts. Right? So I think that it seems there that this was, again, before Hunstein, I believe, and maybe even before Godiva, that this was yet another claim where they were essentially pressing for a technical violation of these statutes as opposed to a violation that, frankly, actually caused them to do anything differently or to have any harm, to really fear that something else, something bad was going to happen to them and then take action based on that fear. Right? That's right. Yeah, I think that's exactly it. So in Trishel, what the court was saying is that at the common law, you do have to show some sort of reliance. You can't just say, you made a misrepresentation and nothing else. Right? That doesn't meet the common law comparator test. Here, we've met that. We've shown reliance and we've shown it both by lost time and by emotional distress. Thank you. Thank you, Ms. Layton. Thank you all. And we have your case under advisement. Our fourth and final